UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                Case No.: 2:13-cr-20481

      v.

                                HON. VICTORIA A. ROBERTS

DEVENKUMAR PATEL,

      Defendant.

_____

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

1

**Table of Contents**

Statement Of The Issue ................................................................4

I.  OVERVIEW ...........................................................................5

II.  FACTUAL AND PROCEDURAL BACKGROUND ......................................8

III.  GUIDELINE CALCULATION .....................................................12

   A.  Loss Calculation ...........................................................14

   B.  Sophisticated Means/Abuse of Position of Trust.........................15

IV.  SENTENCING FACTORS ........................................................19

   A.  The History and Characteristics of the Defendant .....................19

   B.  The Nature and Circumstances of the Offense ..........................21

V.  SUBSTANTIAL ASSISTANCE ....................................................22

VI.  RECOMMENDATION...............................................................24

## <u>Table Of Authorities</u>

**Federal Cases**

*U.S. v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995) ........................................17

*U.S. v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005).....................................16

*U.S. v. Goodwin*, 241 Fed. Appx. 685, 686 (11th Cir. 2007) ................................16

*U.S. v. Hogenboom*, 209 F.3d 665, 671 (7th Cir. 2000) ...........................................17

*U.S. v. Liss*, 265 F.3d 1220, 1229 (11th Cir. 2001) .................................................17

*U.S. v. Nishona*, 156 F.3d 318, 321 (2nd Cir. 1998).................................................17

**Federal Statutes**

18 U.S.C. § 1347 .......................................................................................8

18 U.S.C. § 842 ..........................................................................................8

**United States Sentencing Guidelines**

USSG § 2B1.1(b)(10) ..................................................................... 13, 15, 17

USSG § 3B1.3 ...........................................................................................17

## **Statement Of The Issue**

What is the appropriate sentence for Defendant Devenkumar Patel?

## **Controlling Authorities**

**Federal Statutes**

18 U.S.C. § 1347 ................................................................................................8

18 U.S.C. § 842 ..................................................................................................8

## I.   OVERVIEW

Defendant Devenkumar Patel, a licensed pharmacist and owner of multiple pharmacies in the Eastern District of Michigan, engaged in a scheme to defraud multiple insurance companies by billing for compounded creams pursuant to invalid prescriptions.   The prescriptions were not authorized by the "prescribing" doctor, but were fraudulently created by Patel's pharmacy employees.   Many of these compounded creams contained the controlled drug ketamine.   These prescription drug controlled substances were actually used by patients, without the approval of their treating physician.   *See, e.g.,* Exhibit G, ¶ 3.

The defendant's motive for dispensing unauthorized medications to unsuspecting patients was money.   The compounded creams were typically billed at approximately $700-$1200 per prescription.   The parties stipulated to a total loss amount of $560,000.00, for fraud taking place during a nine-month period at a single pharmacy.   As the true owner of the pharmacies (which were listed in the name of other persons), it was the defendant who personally profited from this scheme.

It was essential to the defendant's scheme to make it appear that the doctor actually prescribed the compounded creams.   Accordingly, he had prescriptions made with physician's names and compounded creams pre-printed on them.   His

employees fraudulently obtained one doctor's signature on some prescriptions by falsely claiming they were refills for medication already prescribed. The pharmacy files contained a forged letter from one of the doctors to the defendant, which contained instructions on how to compound the cream that was supposedly being prescribed by the doctor.

The non-FDA approved topical formulation in the fraudulent letter contains drugs that have severe side effects. The formulation contains the following six prescription drugs: amitriptyline 2%, cyclobenzaprine 2%, ketamine 5%, baclofen 5%, clonidine 0.2%, gabapentin 6%. *See* Appendix at Exhibit D. These drugs may cause side effects such as skin irritation, itching, rash, drowsiness, dizziness, tinnitus (ringing of the ears) and bradycardia (abnormally slow heart rate). The patients were exposed to the risk of these side effects -- even though their physicians never prescribed the compounded cream. And the doctors had no reason to be alert for these side effects, since the defendant was dispensing the drugs without their knowledge.

Many of the creams fraudulently dispensed without the doctor's approval also contained the Schedule III controlled substance ketamine. Ketamine may produce flashbacks, hallucinations, dysphoria, anxiety, insomnia, or disorientation. Ketamine dependence and tolerance may develop in individuals

6

with a history of drug abuse or dependence. Therefore, ketamine should be prescribed and administered with caution. Some of the patients were being treated for pain, meaning that this addictive controlled substance could have a drug interaction with other prescribed narcotics, all without the knowledge of the treating physician.

The defendant's illegal behavior had the effect of falsifying the patient's medical charts kept in the doctor's office. As verified by the investigating agents, patient charts showed the patient visit and the medications prescribed by the doctor. The chart did not show the creams being fraudulently dispensed by the defendant. Any doctor reviewing the patient's medical chart would be misled by the absence of the drugs added by pharmacist Patel and used by the unsuspecting patient.

Based upon the overwhelming evidence collected during the Drug Enforcement Administration's ("DEA") investigation, Defendant pled guilty to both health care fraud and drug diversion. The guideline range in the original plea agreement, and the Presentence Report was 37-46 months. Due to the government's stipulation to an actual loss amount of $560,000.00, and a guidelines amendment to the loss table, the government believes that the correct guideline range is now 30-37 months.

Assuming the court finds the appropriate guideline range to be 30-37 months, the government recommends a sentence of 22 months.   This represents a reduction of 25% from the bottom of the range.   This request is based on the agreed upon sentencing guideline loss calculation and takes into account the defendant's substantial assistance pursuant to U.S.S.G. § 5K1.1.   *See* Docket No. 53.

The defendant's conduct was not merely fraudulent.   It risked the health of patients who used the pharmacy.   The defendant disregarded the safety of hundreds of patients over a nine month period in an attempt to defraud insurers of $560,000.   Moreover, defendant's actions made a mockery of the pharmacy profession.   Only a sentence that includes actual incarceration in a federal prison facility adequately reflects the seriousness of this offense and provides both specific and general deterrence.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Defendant pled guilty to one count of healthcare fraud under 18 U.S.C. § 1347 and one count of distribution of a controlled substance under 18 U.S.C. § 842.

Defendant was the beneficial owner and operator of at least Southfield Medical Pharmacy, Trinity Pharmacy, Canalis Pharmacy, Reliance Pharmacy, VPH Pharmacy and Total Care Pharmacy.   As beneficial owner of these pharmacies,

8

Defendant was responsible for oversight of pharmacy operations, business development and directly benefited from any profits received from the pharmacies.

As part of Defendant's effort to develop business and enrich himself, he permitted, and encouraged, thousands of prescriptions for compounded medications -- which he knew to be fraudulent -- to be filled at his pharmacies.[1]  Specifically, Defendant allowed his pharmacies, including Southfield pharmacy, to bill for high priced compounded medications containing, for example, ketamine.[2]  The physicians who supposedly prescribed these compounded medications include Drs. Ellison, Soskina and Mendiratta.  Interviews with these physicians confirmed that Drs. Ellison and Mendiratta did not write *any* of the compounded creams attributed to them at *any* of Defendant's pharmacies.  *See* Appendix at Exhibits A-D.  Dr. Soskina did not write the majority of the compounded creams at Defendant's pharmacies -- including all of the ketamine cream prescriptions.  *See* Appendix at Exhibits E, F.  Moreover, Dr. Mendiratta confirmed that although he did sign some of the prescriptions filled at Defendant's pharmacies, they were presented to him by Defendant's employee and falsely described as refills.  He did not prescribe any of the original prescriptions.  *See* Appendix at Exhibit D.  Drs. Ellison and Soskina

---

[1]  The fraudulent compounded creams at the center of this case were primarily dispensed from Southfield Pharmacy, Trinity Pharmacy and Total Care Pharmacy.
[2]  Ketamine is a prescription narcotic classified by the DEA as a schedule III drug.

9

also reported that Defendant's employees prepared and delivered prescriptions for them to sign.  *See* Appendix at Exhibits A, B, E, F.  The Defendant's scheme was based on obtaining these prescriptions fraudulently.

Defendant went so far as to have preprinted prescriptions made with Dr. Mendiratta's name and specific compounded medications already on the prescription.  Dr. Mendiratta confirmed that he never had preprinted prescription forms.  *See* Appendix at Exhibit C.  Drs. Ellison and Soskina also stated that Defendant caused preprinted prescriptions to be delivered to them in order to obtain their signature.  *See* Appendix at Exhibits A, B, E, F.  A pharmacist employed by Defendant corroborated the fact that preprinted prescriptions were presented to physicians for their signature ***after*** the compounded drug was dispensed.  *See* Appendix at Exhibit V, ¶¶ 10, 12, 25, 41, 46, 47, 50, 53, 54, 55.  Defendant also caused a fraudulent letter to be written, in the name of Dr. Mendiratta, which allegedly includes a formulation for a topical compounded medication requested by Dr. Mendiratta.  *See* Appendix at Exhibit D.  Dr. Mendiratta denied generating the letter and noted that the letter was not on his letterhead.  *See* Appendix at Exhibit D. Defendant, therefore, put a significant amount of time and thought into producing preprinted prescriptions and causing physician signatures to be forged and/or fraudulently obtained -- all in an effort to enrich himself.  All of this was in total

10

disregard of the health and safety of the patients.

Agents reviewed patient charts with Drs. Ellison, Soskina and Mendiratta. Each doctor confirmed that many of the compounded prescriptions filled at Defendant's pharmacies were not reflected in the corresponding patient charts. *See* Appendix at Exhibits A-F. This documentary review confirmed that the creams were not being prescribed by the doctor, but prescriptions were being created by the pharmacy. The defendant's actions created false medical records.

Patients of Drs. Ellison, Soskina and Mendiratta further confirmed the fact that Defendant's pharmacies were filling fraudulently obtained prescriptions. Many patients were interviewed and stated that they never received compounded medication prescriptions from their doctor and/or that Defendant's pharmacies would waive the co-pay so that they would receive the compounded drug for free. *See* Appendix at Exhibits G-L. Even though the pharmacy would waive the patient's copay -- which incentivized the patient to actually take the fraudulently billed drug from Defendant's pharmacies -- Defendant's pharmacies would still bill insurance companies for the compounds.[3] A pharmacist that worked for Defendant corroborated that Defendant encouraged the waiver of copay so that patients would take compounded drugs that they did not need. *See* Appendix at Exhibit V, ¶¶ 6, 7,

---

[3] The vast majority of profit on compounded prescription drugs comes from the payment received from insurance companies -- not patient copays.

52.

Drs. Ellison, Soskina and Mendiratta's interviews are further corroborated by the profit motive. The only person that benefited financially from Defendant's fraud and drug diversion scheme was the Defendant. The patients receiving the compounded prescriptions were already patients of their respective doctors. The doctors' billing did not increase or decrease based on whether they actually prescribed the compounded creams. The profit motive alone confirms that the Defendant is the person who hatched and orchestrated the scheme to which he pled guilty.

The Defendant's attempt to cover up his illegal conduct was egregious. Defendant orchestrated an attempt to put fraudulent prescriptions into patient charts in order to make it appear that the physicians actually wrote for the compounded prescription medications. *See* Appendix at exhibit D. Specifically, Defendant's employees brought a stack of prescriptions -- 8-9 inches thick -- to Dr. Mendiratta's office to file in corresponding patient charts. *Id.* It is likely, therefore, that Defendant's cover-up masked the true extent of his crimes.

## III.  GUIDELINE CALCULATION

The Government's position is that the appropriate Total Offense Level for Defendant, pursuant to the Sentencing Guidelines, is 22, yielding a range of 30 to 37

months.   The parties agreed in a sentencing stipulation that this is the correct sentencing guideline calculation, except for the defendant's objection to the sophisticated means enhancement.   The following stipulation has been agreed to between the parties:

> The Court was made aware at the status conference and the evidentiary hearing that the defendant is being investigated in an ongoing healthcare fraud, drug diversion and misbranding investigation involving VPH Pharmacy.  The court has also been informed that, although the parties have discussed the matter and the defendant has been provided some discovery, the government is unable offer a global resolution at this time due to the ongoing nature of that investigation.
>
> The parties believe that arguing their respective positions on the VPH investigation would unduly prolong and complicate the sentencing proceedings in this case.  Therefore, unless the Court directs otherwise, the parties will refrain from presenting facts and arguments relating to the investigation at this sentencing.
>
> The defendant understands and agrees that, in the event he does face additional charges from the new investigation, he will not be able to argue that he has already been punished for those offenses by the sentence imposed in this case.
>
> The government will make a 5K1.1 motion for downward departure of approximately 25% from the bottom of the guideline range, that is, 22 months if the correct guidelines range is 30-37 months.
>
> The parties stipulate to a total loss amount of $560,000.00. The government will claim no additional relevant conduct amounts.
>
> The parties will argue the applicability of the sophisticated means enhancement, U.S.S.G. § 2B1.1(b)(10), based on the amendment to that provision.
>
> The parties agree that that the appeal waiver provision of the plea agreement means that neither party will be able to appeal the judge's determination on sophisticated means, the loss amount, or any other guideline provisions in this plea agreement.

An explanation of the Government's calculation is below.

## A.    Loss Calculation

Calculating a mathematically precise intended loss properly attributable to the defendant in this scheme is complex.   The defendant operated a number of pharmacies and engaged in a variety of illegal conduct, including fraudulently procuring many different types of compounded medications, which is difficult to isolate for intended loss purposes.   One method to calculate intended loss could be to total the amount billed from Southfield Pharmacy, Total Care Pharmacy and Trinity Pharmacy for all compounded creams for Drs. Ellison, Soskina and Mendiratta.[4]   The total intended loss using this approach is $4,730,753.

An even more conservative approach to calculating intended loss relative to Defendant's crimes could be to restrict the total loss to all compounded creams dispensed from Southfield Pharmacy for Drs. Ellison, Soskina and Mendiratta.   The total intended loss using this approach is $2,400,341.50.

Finally, the even more conservative approach, and the one agreed and stipulated to by the parties for calculating intended loss relative to Defendant's crimes, is to restrict the total loss to all compounded creams dispensed from

---

[4] This is a conservative approach because it completely excludes, for example, Dr. William Binder and Canalis Pharmacy -- both of which were involved in Defendant's fraud scheme.

Southfield Pharmacy between October 2009 and June 2010 for Drs. Ellison, Soskina and Mendiratta.   These are the restricted dates, covering nine months, that are listed in the factual basis in the guilty plea for the counts of conviction.   The total intended loss using this approach is $685,009.90.   The actual amount paid is $646,430.57. The intended loss is then reduced to $560,000.00 to account for a limited number of compounded cream prescriptions that may or may not have been appropriately dispensed.   The Government is also, therefore, entitled to restitution in the amount of $560,000.

### B.    Sophisticated Means/Abuse of Position of Trust

The defendant stipulated to both of these enhancements in his guilty plea agreement.   The USSG provides for a two-level enhancement for offenses involving "sophisticated means," under Section 2B1.1(b)(10) of the Guidelines. The language of the Guideline section, as amended effective November 1, 2015, provides that the enhancement is warranted if the offense otherwise involved sophisticated means and "the defendant intentionally engaged in or caused the conduct constituting sophisticated means."   USSG § 2B1.1(b)(10).   The explanatory note to the amendment, released on April 30, 2015, states that some "lower-level" defendants were being assessed this enhancement, without a determination that the defendant's own conduct was sophisticated.   This

15

defendant is decidedly not a "lower-level" defendant who was merely participating in a sophisticated scheme created by someone else.

There is no requirement, per the Guidelines, that each of a Defendant's actions be sophisticated in order for the enhancement to apply; it is "sufficient if the totality of the scheme was sophisticated." *U.S. v. Goodwin*, 241 Fed. Appx. 685, 686 (11th Cir. 2007); *see also U.S. v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005) ("Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme.").

The defendant directed what was, by any measure, a highly sophisticated scheme. He was an active participant in the extraordinarily complex process of obtaining fraudulent prescriptions, inducing patients through waived copays to receive drugs they did not need, billing multiple insurance companies for fraudulent compounded medications and attempting to cover up his illegal scheme by putting fraudulent prescriptions in physician patient charts. None of this is easy, or straightforward. It takes coordination, an intricate knowledge of how retail pharmacy works, including insurance billing protocols, and substantial skill to pull off for any length of time. The array of conduct that Defendant was involved in, including the attempted cover-up, is far more sophisticated than a typical fraudulent scheme. Defendant should, therefore, be held accountable for a two-point

16

adjustment pursuant to U.S.S.G. § 2B1.1(b)(10).

Defendant abused a position of trust with respect to health insurers. Defendant was a licensed pharmacist who oversaw the submission of a vast amount of compounded medications to multiple insurance companies -- some of which were not even provided to the patients. Medical professionals, such as pharmacists, occupy a position of trust with respect to insurance providers, and medical professionals who defraud their insurers may be liable under Section 3B1.3 for abusing that trust. *See, e.g., U.S. v. Hogenboom*, 209 F.3d 665, 671 (7th Cir. 2000) ("Medical service providers occupy positions of trust with respect to private or public insurers (such as Medicare) within the meaning of guideline § 3B1.3."). Every circuit that has addressed this topic with respect to physicians has held that these professionals do indeed occupy a position of trust relative to health insurers. *See, e.g., U.S. v. Liss*, 265 F.3d 1220, 1229 (11th Cir. 2001); *U.S. v. Nishona*, 156 F.3d 318, 321 (2nd Cir. 1998); *U.S. v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995). Pharmacists, like physicians, are medical professionals, and like physicians, are relied upon to exercise their professional discretion to insure the integrity of the claims submitted to insurers. The principles articulated in the cases above apply with equal force to licensed pharmacists such as Defendant.

Defendant abused a position of trust with respect to the public, which

expects those in the pharmacy profession to serve as gatekeepers with respect to the distribution of controlled medications. *See, e.g., Am. Pharm. Ass'n, Code of Ethics for Pharmacists*, at ¶ 17 ("The primary obligation of a pharmacist is to individual patients. However, the obligations of a pharmacist may at times extend beyond the individual to the community and society. In these situations, the pharmacist recognizes the responsibilities that accompany these obligations and acts accordingly.").

Most importantly, the defendant abused a position of trust with respect to the patients who came to his pharmacy. Prescription drugs require the professional judgment of a licensed doctor that the drug is necessary and appropriate for treating the medical condition of a particular patient. When the defendant provided prescription drugs to patients without prior approval of the doctor, he risked the health of the patients in order to satisfy his greed. This is an extraordinary abuse of trust.

The insurers involved in this investigation relied upon the Defendant to oversee his pharmacies with integrity and the public depended Defendant to act consistently with his professional obligations in dispensing all medications -- including compounded controlled medications. Defendant, however, did no such thing -- instead he orchestrated a scheme to enrich himself at the expense of his

18

patients and health insurers.   A two-level enhancement for abusing this trust is required.

## IV.   SENTENCING FACTORS

Title 18, United States Code, Section 3553(a), sets forth a number of factors that the Court shall consider in sentencing Defendant.   Factors pertinent to the instant offense are discussed below.

### A.   The History and Characteristics of the Defendant

One disturbing characteristic of the defendant is his lack of candor with the probation department.   The defendant did not make a full disclosure of his financial assets.   In Defendant's presentence investigation report the Defendant's assets and ownership interests are listed.   The basis for the listing of assets is Defendant's own statements.   Defendant has a duty to honestly report his assets and liabilities.   The assets do not, however, list all of the Defendant's pharmacies, including at least, Southfield Pharmacy, Trinity Pharmacy, VPH Pharmacy, Canalis Pharmacy and Reliance Pharmacy.   Defendant is the "beneficial owner" of these pharmacies, and while he may not be the owner on paper, he reaps profits from each of these pharmacies.   Moreover, the following investment and bank accounts belonging to Defendant have been found by the Asset Forfeiture Unit of

the United States Attorney's Office, totaling more than $500,000.00:

| Institution | Account |
|---|---|
| Huntington | Canalis Medical Pharmacy |
| Huntington | Derosa Group |
| Huntington | Derosa Group |
| Fifth Third | VPH Pharmacy PC |
| Fifth Third | VPH Pharmacy PC |
| Oppenheimer | The Dinovelli Group FBO Deven Patel |
| Oppenheimer | The Dinovelli Group FBO Deven Patel |
| Oppenheimer | The Dinovelli Group FBO Deven Patel |
| Oppenheimer | The Dinovelli Group FBO Deven Patel |
| Oppenheimer | Genient Solutions FBO Deven Patel |
| Oppenheimer | Genient Solutions FBO Deven Patel |
| Oppenheimer | Genient Solutions FBO Deven Patel |
| Oppenheimer | Genient Solutions FBO Deven Patel |
| Merrill Lynch | PC Tracking Acct for VPH Pharmacy |
| Merrill Lynch | Deven Patel TTEE Cash Management |
| Merrill Lynch | Deven Patel Roth Retirement |
| Merrill Lynch | Deven Patel IRA |
| Merrill Lynch | Deven Patel TTEE Cash Management |
| Merrill Lynch | Deven Patel C/F Ronan Patel UTMA |

None of these accounts were disclosed to the probation department by Defendant.   Finally, in an email, the Defendant claimed to control "a substantial slush fund of over $820K" as of June 2015.   *See* Appendix at Exhibit W.   The defendant, therefore, has control over far more assets than what he reported to probation.

Defendant's mounting legal issues surrounding his pharmacies have resulted in violence.   Defendant is being sentenced in this case regarding fraud

20

primarily occurring at Southfield Pharmacy.  The defendant is also engaged in civil litigation regarding VPH Pharmacy.  On Friday, April 15, 2016, a deposition in connection with this civil litigation occurred.  During that deposition Defendant was allegedly disruptive, shouting obscenities and shaking uncontrollably -- even though Defendant was not the person being deposed.  At the conclusion of the deposition, Defendant allegedly assaulted the opposing party by punching him in the chest and causing him to fall through the court reporter's screen.  The police were called and a report filed.  *See* Appendix at Exhibit M. Moreover, on April 18, 2016, the Honorable Jeffery S. Matis of the Oakland County Circuit Court, entered a personal protection order against Defendant. Specifically, the basis for the order is "[t]wo or more acts of willful, unconsented contact, repeated harassment, and physical violence."  *See* Appendix at Exhibit U.

### B.    The Nature and Circumstances of the Offense

The essential nature of this offense is grounded in the greed of the defendant.  That greed was sufficient to override his legal and ethical obligations to the patients and the health care insurers, including the Medicare system.  The defendant valued a $700 to $1,200 billing ahead of the health and welfare of a patient.  There are no known adverse health effects to specific patients from the defendant's crimes.  However, it is unlikely that any adverse reactions would be

21

traced to prescription drugs that the treating physician did not know were taken by the patient. The important factor here is not actual harm to the patients, but the defendant's callous disregard for their health. The defendant risked the health of the patients in order to fraudulently bill from $700 to $1,200 per prescription, and did so on hundreds of occasions over a nine-month period. This was not an isolated mistake or a one-time lack of judgment. This is a reprehensible criminal scheme, and the only appropriate punishment for the person who led and profited from this scheme is a term of imprisonment.

## V.     SUBSTANTIAL ASSISTANCE

The Government requests the Court, pursuant to 5K1.1 of the United States Sentencing Guidelines, to depart downward from Defendant's sentencing guideline range of 30-37 months because Defendant has provided substantial assistance to other investigations. The Government specifically requests a 25% downward departure from the bottom of Defendant's guideline range, to 22 months. The reasons for this requested departure are as follows:

Investigation No. 1. The defendant provided assistance in an investigation into another pharmacy, and two owners of that pharmacy. The pharmacy was being investigated for at least health care fraud and misbranding. The defendant worked with federal agents to engage in two or three consensually recorded

22

conversations, both by telephone and in person, with the owners of the target pharmacy.   While Defendant's cooperation has yet not resulted in an indictment of the owners of the pharmacy, the investigation is ongoing and may yet result in criminal charges against these individuals.   However, the defendant's cooperation is finished.   The recordings are not particularly valuable in the investigation, but they represent an effort by the defendant to provide cooperation and resulted in substantial assistance.

Investigation No. 2.   The defendant provided information on a pharmacist who owns a pharmacy.   The target was formerly associated with the defendant. The defendant is no longer on good terms with the target and was unable to make consensually recorded calls.   However, the information was made part of the case file and the investigation may yet result in criminal charges against this individual. The defendant's cooperation is finished.   The defendant also provided general information on other pharmacies, based on his personal knowledge of their activities.   However, no new criminal investigations were opened.

Investigation No. 3.   The defendant was interviewed before the trial of Dr. Binder, as discussed on the record at the motion to withdraw the guilty plea. William Soisson, the assigned AUSA, declined to call the defendant at trial due to credibility issues.   However, this extensive interview represented an effort to

cooperate that should be recognized.   Dr. Binder was eventually acquitted by Judge Lawson.

Accordingly, based on these instances of cooperation, the Government requests this Court grant its §5K1.1 motion for substantial assistance, and recommends a sentence of 22 months.

## VI.    RECOMMENDATION

Defendant was the criminal mastermind behind his pharmacies' fraudulent billing for unnecessary compounded medications, including controlled drugs. Defendant's punishment should take into consideration the motive, the nature of his criminal conduct, his attempted cover-up and the need to deter others from committing health care fraud and illegal drug distribution.   The defendant's sentence should specifically take into account the need to deter licensed healthcare professionals from abusing their licenses to facilitate criminal activity, when that criminal activity creates the risk of patient harm.

Based upon these considerations, the United States respectfully moves this Court for a sentence of 22 months.   The Government strenuously opposes a sentence of probation, home confinement or confinement in a community corrections facility.

24

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

s/*Wayne F. Pratt*
Chief, Health Care Fraud Unit
Assistant United States Attorney
211 West Fort, Suite 2001
Detroit, Michigan 48226
(313) 226-9583
Email:   wayne.pratt@usdoj.gov

/s/ *Michael S. Heesters*
MICHAEL S. HEESTERS
Assistant United States Attorney
211 West Fort, Suite 2001
Detroit, Michigan 48226
(313) 226-9736
Email:   michael.heesters@usdoj.gov

Dated:   April 25, 2016

## <u>Certificate of Service</u>

The undersigned hereby states that on April 25, 2016, I will cause the service of the foregoing motion on the attorney(s) listed below via electronic mail.


Anthony Calamunci
FISHERBROYLES LLP
6800 W. Central Ave., Suite E
Toledo, OH 43617
419-214-1050
anthony.calamunci@fisherbroyles.com


/s/ <u>*Michael S. Heesters*</u>
MICHAEL S. HEESTERS
Assistant United States Attorney
211 West Fort, Suite 2001
Detroit, Michigan 48226
(313) 226-9736
Email:   michael.heesters@usdoj.gov
